UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT W.,[1] | ) |
| | ) No. 21 CV 2663 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) |
| | ) |
| | ) December 20, 2023 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Scott W. seeks supplemental security income ("SSI") benefits asserting that he is unable to work because of his encephalomalacia status post traumatic brain injury, degenerative disc disease of the lumbar spine and cervical spine with radiculopathy, hearing loss, and dysthymia. He brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying in part his application for benefits. Before the court are cross-motions for summary judgment. For the following reasons, Scott's motion is granted, and the government's is denied:

**Procedural History**

Scott filed an SSI application in October 2018, alleging disability beginning in April 2018. (Administrative Record ("A.R.") 26, 23-36.) After his application was denied initially and upon reconsideration at the administrative level, (id. at 26, 109-

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Scott's first name and last initial in this opinion to protect his privacy to the extent possible.

22, 124-36, 151), he sought and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 26, 170-72). Scott appeared with his attorney at an April 2020 telephonic hearing, at which he and a vocational expert ("VE") testified. (Id. at 26, 46-108.) The ALJ issued a partially favorable decision in May 2020, ruling that Scott was not disabled before December 10, 2019, but that he "became disabled on that date and has continued to be disabled through the date of [the ALJ's] decision." (Id. at 22-39.) The Appeals Council denied his request for review, (id. at 10-12), making the ALJ's decision the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Scott then filed this action seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 8).

## Analysis

Scott argues that the ALJ erred by: (1) failing to support the step-five finding with substantial evidence; and (2) not accounting for all of his mental limitations in formulating his residual functional capacity ("RFC"). (R. 16, Pl.'s Br. at 3-15.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and substantial evidence supports the decision, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted).

2

However, the ALJ must "provide a 'logical bridge' between the evidence and his conclusions," *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021), supplying enough detail to "enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having considered the arguments and record, the court concludes that the ALJ did not support his step-five finding with substantial evidence.

**A.     RFC Assessment**

The court begins its analysis by addressing Scott's argument pertaining to his purported RFC because an error here would require a reconsideration of the step-five analysis. Scott suffered a traumatic brain injury in April 2018 when he fell down a set of stairs and was in a coma for a week. (A.R. 32-33.) Since his accident he has experienced difficulty with speech, hearing loss, balance, dizziness, numbness in his legs and feet, depression, anxiety, fatigue, and pain in his neck, shoulder, and back. (Id. at 32-35.) Scott argues that the ALJ erred by not accounting for all of his mental limitations—namely, concentration and pace restrictions—in his RFC assessment and in the hypothetical presented to the VE. (R. 16, Pl.'s Br. at 13-15.) An RFC measures the tasks a person can perform given his limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When assessing the RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). Where

the ALJ does not rely upon medical opinions, he must "thoroughly discuss[] the medical and other evidence," considering each of the claimant's "impairments and related function deficits," *Nina Joyce H. v. Saul*, No. 18 CV 4913, 2020 WL 212771, at *7 (N.D. Ill. Jan. 14, 2020), and "describ[e] how the evidence supports each [RFC] conclusion," *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011).

Scott asserts that despite finding he has a moderate limitation in concentrating, persisting, or maintaining pace ("CPP"), the ALJ failed to include pace-related limitations in his RFC, such as the need for flexibility and to avoid fast-paced production requirements. (R. 16, Pl.'s Br. at 13-15.) To accommodate Scott's mental impairments, the ALJ limited him to short, simple, routine tasks and reduced social interactions. (A.R. 35.) In doing so, the ALJ relied on the opinions of the state agency consultants who opined that Scott could: "understand, remember, carry out and sustain performance of 1-3 step tasks (but would be overwhelmed if the procedures were more complicated); complete a normal workday; interact briefly/superficially with co-workers/supervisors; and adapt to changes/stressors associated with simple routine competitive work activities." (Id.; see also id. at 114, 120, 130, 134.) The ALJ said he found these opinions "persuasive" because they were consistent with the objective medical evidence and the level of treatment Scott received. (Id. at 35.) The ALJ also found "generally persuasive" the opinion of the psychiatric consultative examiner ("CE") who opined that Scott: "could perform simple and routine instructions; would have difficulty handling moderate work pressure and stress; could communicate with co-workers and a supervisor; and could

4

follow, understand, and retain most instructions but might have difficulty retaining them for more than a number of working days." (Id. at 36; see also id. at 719-22.) By contrast, the ALJ found the treating physician's opinion—that Scott would be off task more than 25% of the workday—not "fully persuasive" because his own treatment notes, other evidence, and Scott's testimony did not support this limitation. (Id. at 36.)

The ALJ also considered medical and other evidence, including Scott's own reports and daily activities, and determined that greater restrictions were not warranted. The ALJ explained that although Scott reported difficulties "following instructions, completing tasks, and maintaining a regular work schedule," he could "drive, prepare meals, watch TV, read, manage funds, and use the internet." (Id. at 31.) And during his psychiatric consultative examination, Scott "subtracted serial 7's accurately and without difficulty, repeated 5 digits forward and 4 digits backward, and generally had intact mental status." (Id.) As such, the ALJ supplied substantial evidence to support the mental RFC assessment.

Scott cites the Seventh Circuit's decision in *Pavlicek v. Saul*, 994 F.3d 777 (7th Cir. 2021), to argue that a pace-related limitation was required here. But in *Pavlicek* the state agency consultants opined that the claimant could "perform at a consistent pace particularly if [he] is engaged in a simple, repetitive task[]." *Id.* at 780 (internal quotations omitted). Based on the record evidence, including the consultants' opinions, the ALJ in *Pavlicek* restricted the claimant in part to "mak[ing] simple work-related decisions in an environment without fast-paced production

5

requirements and with few or no changes in work duties." *Id.* at 781. Scott argues the ALJ erred by not adopting a similar pace-related limitation here. (R. 16, Pl.'s Br. at 13-14.) But "the CPP inquiry is fact specific," as Scott acknowledges, (id. at 13), and he fails to establish that a pace restriction is necessary, (R. 18, Govt.'s Resp. at 4); *see also Lockett v. Saul*, 834 Fed. Appx. 236, 239 (7th Cir. 2020) ("A moderate rating in maintaining [CPP] means the claimant is so limited in *at least one of* those areas, not necessarily all three."). The ALJ here was entitled to rely on the opinions of the state agency consultants and CE. *Lockett*, 834 Fed. Appx. at 239. Accordingly, remand is not warranted on this ground.

**B.  Step-Five Finding**

Scott argues that the ALJ erred at step five by finding that he could perform a significant number of jobs in the national economy. (R. 16, Pl.'s Br. at 3-13.) At step five, "the agency bears the burden of demonstrating that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022). When determining whether the Commissioner has satisfied her burden, the ALJ generally considers testimony from a VE regarding available jobs. *Id.* However, the ALJ must ensure that substantial evidence supports the VE's testimony that "suitable jobs exist in significant numbers." *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018). To qualify as substantial evidence, the VE's job-number estimate must be "the product of a reliable methodology," *Ruenger*, 23 F.4th at 763 (citing *Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020)), or corroborated by "'well-accepted' sources" and

6

explained "'cogently and thoroughly,'" *id.* (citing *Biestek*, 139 S. Ct. at 1155). "And when, as here, the claimant challenges the job-number estimate, the ALJ must compel the [VE] to offer a 'reasoned and principled explanation' of the methodology she used to produce the estimate." *Id.*

A VE may use a variety of sources to estimate job numbers, including the Dictionary of Occupational Titles ("DOT"), which "lists job titles and their requirements" but not "how many positions exist in the national economy for each job title."[2] *Id.* at 761-62. Given this shortcoming, a VE may also use the Department of Labor's Occupational Employment Survey, which provides job estimates "not by DOT job titles," but by the "standard occupational classification" ("SOC") system. *Id.* at 762. "This creates a matching problem" because "SOC codes sort jobs into broad occupational categories" that in turn "encompass multiple DOT job titles," allowing a VE to "identify the number of jobs in the larger SOC grouping but [not] how those jobs are distributed among individual DOT job titles within that grouping." *Id.* As a result, a VE may also consider the Occupational Employment Quarterly, which estimates the number of available jobs in the national economy for each DOT job title "using the 'equal distribution method,' a calculation that simply divides the number of jobs estimated for an SOC code by the number of DOT titles contained within that SOC code." *Id.* But the Seventh Circuit has "repeatedly questioned the accuracy of

---

[2] The Seventh Circuit has expressed concern about the "outdated" nature of the DOT. *Ruenger*, 23 F.4th at 761; *see also Daniel L. v. Kijakazi*, No. 22 CV 6976, 2023 WL 5830807, at *9 (N.D. Ill. Sept. 8, 2023) (noting DOT "dates back 46 years to 1977," and based on cases reviewed in this district, VEs have estimated job numbers for the same DOT entry with "massive fluctuations").

7

the equal distribution method because it illogically assumes that each DOT job title within an SOC code exists in equal numbers in the national economy." *Id.* (citations omitted).

The VE in this case testified at the administrative hearing that occupations such as table worker (6,000 jobs nationally), inspector (8,000), document preparer (15,000), and touch up screener (8,000) would be available for the hypothetical individual with Scott's RFC. (A.R. 38.) Scott's attorney then asked the VE for the source of her job data, starting with the inspector job. (Id. at 93.) The VE testified in part:

> A. The only published source of numbers would be . . . through the Bureau of Labor Statistics ["BLS"] and they issue a publication . . . where they identify occupations by . . . [SOC], and they indicate the number of—and what the specific DOTs are within that broader group. And I look at that total number and an estimate of what would be a particular DOT within that number, so it would be an estimate.
>
> . . .
>
> Q. So what was the SOC code that you looked at for the inspector?
>
> . . .
>
> A. Hang on one second. 51-9061.
>
> Q. [A]nd how many DOT codes are listed under that SOC code?
>
> A. 780.
>
> Q. All right. So, can you tell us how you then extrapolate—and what's the total number of jobs that BLS gives for [those] 780 DOT codes?
>
> A. About 600,000.

8

Q. So, how then did we go from 600,000 to 8,000 of this particular DOT code?

A. As I said to you before, I have to make an estimate of what is a more generic occupation, which is what I typically respond with, in terms of any hypothetical that I'm posed with occupations that would, in fact, be ones not arcane and not obscure. Things like testers, inspectors, and graders. I'd pick an occupation that is more broad-based. And, honestly, one would have to make an estimate based upon looking at the large number of DOTs that are within any SOC group.

Q. So, are you relying on a personal experience with this position to substantiate . . . your estimation?

A. I can say to you that an inspector, or tester, or grader inspector is a pretty broad occupational category of which, you know, over my, I don't know, 30 years of being a [VE], it's not an obscure job title and it's one that I've had where individuals perform that particular set of tasks[.]

Q. Where do you know of the job of inspector currently being performed according to the hypothetical []?

A. Well, I'm not sure if you're asking me to say a particular company, but I would say that the idea that a person is inspecting a product in a variety of industries to make sure it meets a particular quality standard or a go or no-go inspection is a pretty straightforward kind of occupation. It's not peculiar or particular to one unusual industry to manufacturing setting.

Q. Can you name one place where you've studied this position according to the constraint of [a hypothetical previously posed by the ALJ]?

A. No. And I wouldn't—I would anticipate that there will be a series of questions of this type about every one of the numbers that I've given and I could tell you that probably my answers will be identical, in that I can only indicate to you I have—and my company when I had other individuals doing survey[s]—had done hundreds of thousands of surveys over many, many years, and that an inspector would not have been an occupation that was peculiar, unusual, or arcane. I cannot name a specific company, and I wouldn't do so . . . in terms of any of the particular numbers I've given, so that same question I

9

>would answer similarly if you were to ask me each time we go through one of these hypotheticals.
>
>. . .
>
>Q. I'm asking did you reference any specific surveys per . . . your testimony?
>
>A. I did not.
>
>. . .
>
>Q. So, when you went to the [BLS] and you entered in—so, you can tell me what page did you go to, to enter in this SOC code?
>
>A. I don't know. You know, I made a list of BLS codes many years ago. The BLS codes haven't changed. So I'm not on the internet and I'm not looking [at] what you're looking at right now . . . . And I'm not going to be able to satisfy your questions, in that the best that I can do is do what I do by taking a very generic job title, a conservative number, and make my best estimate, and that's based on the combination of factors of what I have done in the past and the hearings that I have listened to, and that is the best I'm going to be able to do in answering your question.
>
>Q. Again, I'm sorry. I can't quite understand that answer, so let me try it this way. If the Judge were to ask you to reproduce your method of job numbers for each job on a piece of paper, would you be able to write down a step by step for how you came to each number?
>
>A. No. I would say to him in a narrative form what I have said to you.
>
>Q. Okay. So, please in a narrative form without being general let's start, because you're—
>
>A. No. I am not able to do that.

(Id. at 93-101.)

In his decision, the ALJ noted Scott's "numerous objections" but dismissed them and relied on the VE's testimony to find at step five that Scott could perform a significant number of jobs in the national economy. (Id. at 27-28, 37-38.) The ALJ

10

described the VE's methodology as first looking to the BLS, which "lists job numbers according to [SOC] codes, organized by job categories and not specific job titles, and [] there are often multiple DOT job titles within each SOC code." (Id. at 27.) Next, the ALJ said the VE "makes a conservative estimate of the number of jobs that exist for a specific DOT title within an SOC code," using extensive survey data compiled by her company and testimony of other claimants. (Id. at 27-28.) He found this methodology "reliable and reasonable" and, as such, accepted the VE's testimony in deciding that work existed in significant numbers in the national economy that Scott could perform. (Id. at 38.)

Scott asserts the ALJ erred by relying on the VE's testimony. (R. 16, Pl.'s Br. at 3-13.) For starters, he argues that the ALJ "should have known" the VE's job-number estimate was not reliable because she used "suspiciously round numbers" for all proposed job titles. (Id. at 3.) Scott refers to the VE's job numbers as "broad guesses," (id.), suggesting an estimate alone is insufficient to establish substantial evidence. But the Seventh Circuit has made clear that "the reliability of a VE's job-number estimate 'does not require meeting an overly exacting standard,' as the 'law recognizes and respects' the 'realities and limitations' of calculating the number of jobs available for a claimant to work." *Hohman v. Kijakazi*, 72 F.4th 248, 253 (7th Cir. 2023); *see also Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023) (finding that "precise count is not necessary," so long as VE's job-number testimony is "supported with evidence sufficient to provide some modicum of confidence in its reliability" (internal quotations and citations omitted)).

11

Scott next asserts that the valid jobs identified by the VE total 22,000 in the national economy, which he says is not sufficient to show that he is capable of performing "jobs existing in significant numbers in the national economy." (R. 16, Pl.'s Br. at 3.) Yet the number Scott uses does not include one of the jobs identified by the VE—that of document preparer, with 15,000 jobs nationally. (See R. 18, Govt's Mem. at 10, 14.) The government contends 37,000 jobs is sufficient but acknowledges there are few Seventh Circuit decisions addressing "what constitutes a significant number of jobs nationally rather than regionally." (Id. at 13.) While a few cases find 30,000, 110,000, and 140,000 jobs nationally to be significant, they "rel[y] on a case that was determining the significance of regional rather than national numbers." (Id. (citing *Mitchell v. Kijakazi*, No. 20-2897, 2021 WL 3086194, at *3 (7th Cir. July 22, 2021); *Primm v. Saul*, No. 19-1514, 2019 WL 6220541, at *5 (7th Cir. Nov. 21, 2019).) In any event, the government points to cases from other circuits finding as few as 6,000 jobs nationally to be significant. (Id. at 14 (collecting cases).) But the court need not reach the issue of whether 22,000 or 37,000 jobs is sufficient because the court is not satisfied that the ALJ supplied substantial evidence to support his step-five finding based upon the VE's testimony.

The court agrees with Scott that the VE did not use a reliable methodology in estimating job numbers available in the national economy. (R. 16, Pl.'s Br. at 4-8.) Scott likens the current case to that of *Brace*, 970 F.3d at 820, in which the Seventh Circuit deemed unreliable a VE's testimony where he could not explain the methodology he employed to "connect[] job titles [in the DOT] to reliable estimates of

12

the number of jobs for each title." (R. 16, Pl.'s Br. at 5-6.) As in *Brace*, the VE in this case said she consulted the BLS but was not able to "explain how she used the data or why the data was relevant for a DOT title[-]based estimation." (Id. (citing A.R. 100-01).) Moreover, Scott points out that the VE never claimed her methodology was "well-accepted," and the ALJ did not ask "a single question" about how the VE calculated her job-number estimate, even though Scott's attorney objected that he could not follow the VE's path of reasoning. (Id. at 6.)

The government responds that the ALJ "thoroughly evaluated" the VE's "clear[] and succinct[]" testimony, as well as Scott's objections, and "reasonably relied" on the VE's job-number estimate. (R. 18, Govt.'s Mem. at 11-13.) The government describes the VE's methodology as first consulting BLS, which provides job numbers for each SOC, and then breaking down the numbers "by looking at the relevant job within that category and using her 30 years of personal experience and the hundreds of thousands of surveys performed by her and her company to arrive at an estimate." (Id. at 11.) Insofar as Scott asserts the VE should have consulted another source, the O*NET, when developing job estimates, the government correctly points out that applicable regulations require use of the DOT instead. (Id. (citing 20 C.F.R. § 404.1566(d)).) And the government contends the ALJ did not need to ask the VE questions about her methodology because Scott's attorney asked "many questions."[3] (Id. at 12.)

---

[3] The government also takes issue with Scott's assertion that the VE "culled her job numbers from testimony given by other VEs in different hearings." (R. 18, Govt.'s Mem. at 12 (citing R. 16, Pl.'s Br. at 6-7).) But the VE alluded to "taking a very

13

Despite the ALJ's—and the government's—attempt to make sense of the VE's testimony, the VE did not "cogently or thoroughly" explain how she reached her job-number estimate. *Ruenger*, 23 F.4th at 763. The court is mindful of the Supreme Court's decision in *Biestek*, 139 S. Ct. at 1157, which "declined to impose a categorical rule making a [VE]'s testimony unreliable whenever she refuses to provide data." *See Hohman*, 72 F.4th at 253 ("[A] VE's failure to provide exact data or calculations does not itself make the testimony unreliable."); *Fetting*, 62 F.4th at 339 ("[A] VE is not required to use a market study, computer program, or publication to make his calculations."). However, here "the issue . . . [was] not that the [VE] failed to provide specific numbers," but rather that "her testimony lacked the clarity needed for the ALJ to have confidence in her estimates." *Ruenger*, 23 F.4th at 764. The VE simply did not explain "how her experience helped her to determine the number of jobs plaintiff could perform or identify any of the factors that led her to her 'best estimate.'" *James M. v. Kijakazi*, No. 20 CV 2082, 2023 WL 3652862, at *5 (N.D. Ill. May 25, 2023). Put another way, the VE did not "elaborate upon her methodology" of how past experiences or hearing testimony from other VEs helped her narrow 600,000 jobs from the applicable SCO code to 8,000 jobs for the one relevant DOT code.[4] *Ruenger*,

---

generic job title, a conservative number, and mak[ing] my best estimate . . . based on the combination of factors of what I have done in the past *and the hearings that I have listened to.*" (A.R. 101 (emphasis added).)

[4] As such, this case differs from *Fetting*, 62 F.4th at 339, in which the Seventh Circuit upheld an ALJ's reliance on testimony by a VE where the expert reasonably connected the job-number estimate to knowledge and experience, thereby providing a logical bridge between the evidence and estimate. The VE did so by giving "enough

14

23 F.4th at 764; *see also Brace*, 970 F.3d at 823 ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." (quotations and citation omitted)). Nor did the VE's "incant[ation]" that she selected a "very generic job title" and "a conservative number" to "make [her] best estimate" resolve the concerns. *James M.*, 2023 WL 3652862, at *5; (A.R. 100-01).

Another court in this district recently grappled with a similar "matching problem" and deemed the VE's testimony unreliable. *James M.*, 2023 WL 3652862, at *6. Rather than "describ[ing] the factors or considerations she relied on to resolve the matching problem," the VE in that case "repeatedly invoked her [experience] and insisted she could provide only a 'best estimate' of the number of jobs that [the] plaintiff could perform." *Id.* In doing so, "the VE never explained why reducing the job numbers in [the fashion she did] made her job-estimate reliable." *Id.* The court reversed, finding that "[w]hile it is undisputed that 'a VE may draw from [her] expertise' and experience when providing job-number testimony, the VE must establish that [she] brought some 'aspect of [her] experience to bear on the reliability of those numbers." *Id.* (citing *Rennaker v. Saul*, 820 Fed. Appx. 474, 479 (7th Cir. 2020)). "In other words, the VE must 'say *why* [she] thought [her] numbers were reliable.'" *Id.* (emphasis in original); *see also Teteak v. Kijakazi*, No. 20 CV 878, 2021 WL 3828831, at *5 (W.D. Wis. Aug. 27, 2021) (remanding where ALJ relied on VE's

---

detail for [the court] to understand the sources of his data and the general process he adopted." *Id.*

15

testimony that job-number estimate was based on experience without explaining why that was so). The same is true here.

In any event, simply reducing job numbers by a certain percentage to craft a "best estimate," as Scott argues occurred here, (R. 16, Pl.'s Br. at 12), does not "eliminate the possibility . . . that the remaining jobs included some that were not an appropriate fit" based on the RFC assessed by the ALJ, *James M.*, 2023 WL 3652862, at *6. Scott contends the jobs the VE identified require more skill and contact than the mental RFC allows, further eroding the pool of jobs available to him. (See R. 16, Pl.'s Br. at 4, 9, 11-12.) For example, the document preparer job has a reasoning level of three, which the VE handbook says may be "too complex for an individual limited to 'simple' or 'repetitive' tasks." (Id. at 4 & n.3.) Other jobs identified by the VE have a reasoning level of two, requiring the ability to follow detailed instructions. (A.R. 27.) And the touch-up screener position requires a training period, necessitating contact with others to learn on the job.[5] (See R. 16, Pl.'s Br. at 11-12; see also A.R. 348.) Because the ALJ limited Scott to "short, simple, routine tasks," "occasional interaction with the general public," and "only brief, superficial interaction with co-workers and supervisors," (A.R. 32), Scott asserts the jobs identified by the VE would not be suitable for him, (R. 16, Pl.'s Br. at 11-12). The court shares Scott's concerns. At bottom, the Commissioner fails to satisfy her burden of showing significant jobs

---

[5] The government argues that Scott did not develop this argument at the administrative level or in his opening brief in this case. (R. 18, Govt.'s Mem. at 9.) The court disagrees. Scott sufficiently addressed this issue before the agency and here to avoid forfeiture. (See A.R. 104, 342-49; R. 16, Pl.'s Br. at 11-12; R. 20, Pl.'s Reply at 1-2.)

16

exist in the national economy for Scott based on his "abilities and limitations." *Ruenger*, 23 F.4th at 761; *see also Brace*, 970 F.3d at 823 (noting agency does not satisfy burden by "taking a 'trust me' approach").

Reliability concerns "could have been avoided by further testimony from the [VE]" during the hearing, but "the ALJ did not press her to elaborate upon her methodology." *Ruenger*, 23 F.4th at 764 ("[T]he ALJ has a duty to spend time inquiring into the [VE's] methodology."). As it stands, the VE's testimony lacks the support of substantial evidence and a new hearing is needed to allow the VE "to expand on her testimony or make some other showing that significant jobs exist."[6] *Id.*

## Conclusion

For the foregoing reasons, Scott's motion for summary judgment is granted, and the government's is denied.

ENTER:

Young B. Kim
United States Magistrate Judge

---

[6] Given the court's ruling requiring a new step-five hearing on remand, it need not address Scott's argument that the ALJ did not address his post-hearing objections. (R. 16, Pl.'s Br. at 8-11 (citing A.R. 342-57); R. 20, Pl.'s Reply at 4-6.)

17